UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| JOSEPH KIDD, | ) |  |
|---|---|---|
| Plaintiff, | ) |  |
| v. | ) | CAUSE NO. 3:16-CV-210-MGG |
| WALLACE PORK SYSTEMS, LTD., | ) |  |
| Defendant. | ) |  |

| RAY RISNER, | ) |  |
|---|---|---|
| Plaintiff, | ) |  |
| v. | ) | CAUSE NO. 3:16-CV-211-MGG |
| WALLACE PORK SYSTEMS, LTD., | ) |  |
| Defendant. | ) |  |

**OPINION AND ORDER**

These cases[1] arise from a dispute over overtime pay between Plaintiffs, Joseph Kidd (Cause No. 3:16-cv-210-MGG) ("the '210 case") and Ray Risner (3:16-cv-211-MGG) ("the '211

---

[1] Based on the agreement of the parties at the Rule 16 Preliminary Pretrial Conference on January 10, 2017, this Court consolidated Kidd's and Risner's actions for pretrial procedures, including briefing of any dispositive motions. ['210 case, DE 18; '211 case, DE 19]. The parties then filed identical summary judgment motions in both cases and the Court now issues an identical Opinion and Order in both cases. Citations to single docket entries in this Opinion and Order are from the '210 case. Relevant docket entries include:

| '210 Docket Entries | '211 Docket Entries |
|---|---|
| DE 19, Joint Stipulation of Facts | DE 20 |
| DE 19-3, Wallace Pork's Ex. C (DOL Report) | DE 20-3 |
| DE 20, Kidd's Mot. Partial Summ. J. | DE 21, Risner's Mot. Partial Summ. J. |
| DE 21, Wallace Pork's Mot. Summ. J. | DE 22 |
| DE 22-1, Steve Wallace 3/1/17 Aff. | N/A |
| DE 32 at 4–64, DeWayne Doty 7/19/17 Dep. Tr. plus Exs. | N/A |
| DE 32 at 65–67, Wallace Pork's Supp'l Answers to Pls.' First Set of Interrogs. | N/A |

case"), and their former employer, Wallace Pork Systems, Ltd. ("Wallace Pork"). Wallace Pork operates both a hog farm in Kokomo, Indiana, and a feed mill in Winamac, Indiana. Plaintiffs were employed at the Feed Mill between 2013 and 2016, during which time they often worked more than forty hours per week and were never paid overtime. On February 29, 2016, Plaintiffs both filed complaints in Pulaski County Superior Court alleging that Wallace Pork's failure to pay them overtime constituted violations of Indiana's minimum wage and wage payment statutes as well as the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. The cases were removed to this Court on April 5, 2016, based upon original jurisdiction arising from their claims under the federal FLSA.

After discovery closed, Plaintiffs filed the instant motions for partial summary judgment on February 28, 2017, and Wallace Pork filed its motions for summary judgment on March 1, 2017. Now ripe,[2] the parties' cross motions for summary judgment hinge upon diametrically opposed perspectives on whether Plaintiffs' work at the Feed Mill constituted secondary agriculture so as to exempt them from overtime pay under Section 13(b)(12) of the FLSA.

The undersigned heard oral argument on the motions on September 20, 2017. The undersigned retains jurisdiction over these cases based on the parties' consent and 28 U.S.C. § 636(c). Having considered the parties' briefs and oral argument, the undersigned issues the following Opinion and Order denying Plaintiffs' motions for partial summary judgment and denying in part and granting in part Wallace Pork's motions for summary judgment.

I.  **RELEVANT BACKGROUND**

---

[2] After the parties completed briefing the motions for summary judgment, the Court reopened discovery and permitted supplemental briefing, which was timely completed by September 1, 2017. [*See* DE 24, DE 25, DE 26, DE 28, DE 32, DE 34, DE 35].

The following facts are primarily not in dispute.  Where the facts are in dispute, this Court has determined that the disputes are either not material or has chosen to address such disputes in the Court's substantive analysis of the issues.

Wallace Pork, a limited partnership, was created in February 1994 with the primary purpose of raising hogs.  [DE 19-3 at 1–2].  On average, Wallace Pork has raised approximately 25,000 hogs per year at its Hog Farm and has contracted with third parties to raise an additional 45,000 hogs per year on land not owned by Wallace Pork.  [DE 19 at 2, ¶ 8].  From 2012 to present, Wallace Pork employed about 10–11 individuals at the Hog Farm on average annually.  [*Id.* at 3, ¶ 13].

In 2011, Wallace Pork opened the Feed Mill in 2011 for the purpose of "grind[ing] grain products purchased from ethanol manufacturers and various other suppliers and enhance the ground pulp with vitamins and other growth products to create animal feed."  [*Id.* at 2, ¶ 4; *see also* DE 22-1 at 4, ¶¶ 13–14].  From the Feed Mill's inception until the summer of 2016, Wallace Pork used its own employees[3] to produce animal feed at the Feed Mill while simultaneously contracting with Bi-County Pork, Inc. ("Bi-County") to purchase feed produced by Bi-County's own staff at its independent, neighboring facilities using inputs provided solely by Wallace Pork.  [*Id.*].  Bi-County only produced feed for Wallace Pork and Wallace Pork purchased all the feed Bi-County produced.  [*Id.*; DE 32 at 18, 53:23–54:6].  All of Wallace Pork's feed—both that produced at the Feed Mill and that produced by Bi-County—is either fed to animals owned or raised by Wallace Pork or sold to third-parties.  [DE 19 at 2].

Kidd worked at the Feed Mill from October 10, 2013, until January 26, 2016.  [*Id.* at 3, ¶ 15].  Risner worked at the Feed Mill from August 27, 2013, until January 23, 2016.  [*Id.*, ¶ 16].

---

[3] From 2012 until 2015, the Feed Mill averaged about 15-16 employees annually.  [*See* DE 19 at 2, ¶ 12 (citing annually employee statistics)].

Neither Kidd nor Risner ever worked at Wallace Pork's Hog Farm and neither had any work responsibilities at the Hog Farm. [*Id.*, ¶¶ 17, 19]. While employed at the Feed Mill, Kidd worked the afternoon shift and Risner worked the day shift. [*Id.*, ¶¶ 18, 20]. The duties of both Plaintiffs included making feed with a pay loader, scheduling delivery trucks, working with bag and bulk ingredients, and performing occasional repair work. [*Id.*]. Kidd also performed some associated supervisory work. [*Id.*, ¶ 18]. Both Plaintiffs' direct supervisor was DeWayne Doty, Production Supervisor. [*Id.*, ¶ 21]. Neither Kidd nor Risner ever worked at Bi-County.

Before Plaintiffs began working for Wallace Pork at the Feed Mill, at least one other Feed Mill employee complained about not receiving overtime pay. [*Id.* at 4, ¶ 26]. The complaint prompted an investigation by the United States Department of Labor ("DOL") into the applicability of the FLSA's overtime exemption for secondary agricultural labor at the Feed Mill. [*Id.*]. The DOL's investigation covered the period from March 5, 2011, until March 1, 2013. [DE 19-3 at 4]. After holding a final conference on June 16, 2013, with Wallace Pork's owner, Steve Wallace, and the Feed Mill's manager and Production Supervisor, DeWayne Doty, the DOL representative issued a final report on June 20, 2013. [*Id.* at 6].

In the final report, the DOL concluded that the Feed Mill's operations warranted a secondary agriculture designation exempting Feed Mill employees from overtime pay because the primary use of the feed produced there was feeding the Wallace Pork hogs. [*Id.*]. The DOL supported its conclusion with statistics showing that 77,000 tons of feed were produced and 42,900 tons were used on the Wallace Pork farms with the remaining 34,100 tons being sold to other users.[4] [*Id.* at 2]. In other words, the DOL found that Wallace Pork used 55% of the feed

---

[4] The DOL report does not explain where it found or how it calculated these numbers. As recently as oral argument before this Court on September 20, 2017, Wallace Pork contended that the DOL must have found this information while reviewing the company's records during the investigation, but could not persuasively corroborate the DOL's numbers. Wallace Pork's supplemental briefing included an affidavit from Steve Wallace who also attempted to

4

it produced itself and sold the remaining 45%. The DOL representative appears to have been influenced by assurances from Wallace and Doty that the Feed Mill "operation [was] created for the intent of getting cheap feed for their own animals." [*Id.* at 6].

Nevertheless, the DOL representative conveyed to Wallace and Doty "that although the [Feed Mill] enterprise qualified for secondary agriculture at this time and date, the success with outside suppliers and clients may change that designation in the future." [*Id.*]. After delineating the special factors found in 29 C.F.R § 780.147[5] that must be considered in any analysis of secondary agricultural activities, the DOL representative also "cautioned Steve Wallace that having a business with ADV approximating $26 million dollars will bring the attention of employees, plus private and public investors." [DE 19-3 at 6]. The DOL representative then noted that the "practice performed today as secondary agriculture may be classified tomorrow as manufacturing." [*Id.*].

---

explain the DOL's numbers with the following facts: (1) daily fluctuations in both its and its customers' need for feed; (2) annual fluctuations in the feed Wallace Pork can produce and the number of customers available to buy the feed; and (3) Bi-County's production of most of the feed Wallace Pork sold. [DE 32 at 63, ¶ 16]. Nevertheless, counsel at oral argument agreed that the DOL's 45% sales number could not be fully explained.

[5] As cited by the DOL representative, secondary agriculture special factors under 29 C.R.R. § 780.147 that must be considered

> include the type of product resulting from the practice:
> - as to whether the natural state of the commodity has been changed . . . [to] mark[]a dividing line between processing as an agricultural function and process as a manufacturing operation.
> - . . . the value added to the product as the result of the practice and whether a sales organization is maintained for the disposal of the product.
> - Seasonality of the operation involved in the practice would not be very helpful as a test to distinguish between operations incident to agriculture and operations of commercial or industrial processors who handle a similar volume of the same seasonal crop.
> - But the length of the period during which the practice is performed might cast some light on whether the operations are conducted as a part of agriculture or a separate undertaking when considered together with the amount of the investment, payroll, and other factors.
> - In some cases the fact that products resulting from the practice are sold under the producer's own label rather than that of the purchaser may furnish an indication that the practice is conducted as a separate business activity rather than a part of agriculture.
> - 

[DE 19-3 at 6].

Through discovery in these actions, Wallace Pork has reported that the Feed Mill and Bi-County combined produced approximately 120,000 tons of feed for Wallace Pork annually between 2012 and 2015 with about 90,000 tons being sold annually to third parties. [DE 19 at 2, ¶ 5; DE 22-1 at 4, ¶¶ 13–14; DE 32 at 66]. At the high water mark, about 75% of Wallace Pork's total feed output was sold to third parties with 75–80% of that total feed output being produced by Bi-County. [DE 22-1 at 4, ¶¶ 13–14]. Wallace Pork also reports that "something less than half of [the 120,000 tons of total feed output] was produced by Wallace Pork employees using Wallace Pork facilities." [DE 32 at 66]. The record includes no further detail regarding how much feed the Feed Mill or Bi-County individually produced. However, Wallace Pork has produced evidence of its annual gross revenue, including revenue from the sale of animal feed and hogs, between 2012 and 2015; its annual gross revenue from the sale of animal feed during the same years; and its annual gross revenue from sale of hogs during that time period. [DE 19 at 2, ¶¶ 6, 9, 10].

Kidd and Risner both worked more than forty hours per week sometimes, but Wallace Pork never paid them at an overtime rate. Wallace Pork considers all of its employees, including those at the Feed Mill, to be agriculturally exempt from overtime under state and federal law. Based on the premise that the Feed Mill operation is more akin to manufacturing than agriculture, Plaintiffs filed their respective lawsuits after they resigned from Wallace Pork seeking overtime pay for their work at the Feed Mill.

Through their instant motions, Plaintiffs seek partial summary judgment as to whether Wallace Pork's failure to pay them overtime wages is a violation of the FLSA, 29 U.S.C. § 207(a). [DE 20 at 22]. Plaintiffs do not seek summary judgment on whether Wallace Pork's alleged FLSA violation was willful and how much the liquidated damages for the alleged

6

violation would be.  [*Id.*].  Wallace Pork, on the other hand, contends that its operations have not changed since the DOL issued its report in June 2013.  [DE 22 at 4].  Therefore, Wallace Pork seeks summary judgment on Plaintiffs' FLSA claims arguing that the DOL's conclusion should be given deference and that Kidd and Risner were exempt from overtime pay as employees in secondary agriculture while they worked at the Feed Mill.

Plaintiffs concede that their state law claims are subsumed by their FLSA claims as Wallace Pork argued in its motions for summary judgment.  [DE 25 at 4; *see also* DE 22 at 6].  Therefore, the Court **GRANTS** Wallace Pork's motions for summary judgment on Plaintiffs' state law claims.  ['210 case, DE 21; '211 case, DE 22].

**II.    ANALYSIS**

    **A.    Summary Judgment Standard**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001).  In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the nonmoving party as well to draw all reasonable and justifiable inferences in favor of that party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *King v. Preferred Technical Group*, 166 F.3d 887, 890 (7th Cir. 1999).

To overcome a motion for summary judgment, the nonmoving party cannot rest on the mere allegations or denials contained in its pleadings.  Rather, the nonmoving party must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial.  *Celotex v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200

7

F.3d 1081, 1088 (7th Cir. 2000). Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, "[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted).

## B. Applicability of Agricultural Exemption to Feed Mill Employees

Under 29 U.S.C. § 213(b)(12), the overtime provisions of the FLSA do not apply to "any employee employed in agriculture . . . ." The FLSA distinctly identifies two branches of "agriculture": primary agriculture, which includes, as relevant here, the raising of livestock; and secondary agriculture, which includes practices "performed by a farmer or on a farm as an incident to or in conjunction with such farming operations." 29 U.S.C. § 203(f); *see also* 29 C.F.R. § 780.105. The parties here agree that the work Plaintiffs performed at the Feed Mill only qualifies for the agricultural exemption from overtime pay if it constituted secondary agriculture—if it was performed as an incident to or in conjunction with Wallace Pork's hog raising operations at the Hog Farm, about 40 miles away from the Feed Mill.

Manufacturing enterprises conducted by a farmer or on a farm are not automatically considered farming or agricultural operations under the FLSA. *Maneja v. Waialua Agric. Co., Ltd.*, 349 U.S. 254, 264 (1955). When evaluating the agricultural character of particular enterprises, especially milling operations, a court "must look to all the facts surrounding a given process or operation to determine whether it is incident to or in conjunction with farming." *Id.*; *see also* 29 C.F.R. § 780.145. The analysis does not "depend on any mechanical application of

8

isolated factors or tests," but is determined through review of the overall circumstances and situation at the relevant enterprise. 29 C.F.R. § 780.145; *see also Rodriguez v. Whiting Farms, Inc.*, 360 F.3d 1180, 1186 (10th Cir. 2004). Nevertheless, various factors have been identified as relevant to any analysis of whether a practice is performed as an incident to or in conjunction with farming operations. *Rodriguez*, 360 F.3d at 1186; *see also Maneja*, 349 U.S. at 265–69; 29 C.F.R. § 780.145.

Generally, courts consider "the common understanding of farming, competitive factors, and the prevalence of the practice by farmers." *Rodriguez*, 360 F.3d at 1186 (citing 29 C.F.R. § 780.145). Other factors to consider include

> (1) the size of the operations and respective sums invested in land, buildings and equipment for the regular farming operations and in plant and equipment for performance of the practice; (2) the amount of the payroll for each type of work; (3) the number of employees and the amount of time they spend in each of the activities; (4) the extent to which the practice is performed by ordinary farm employees and the amount of interchange of employees between the operations; (5) the amount of revenue derived from each activity; (6) the degree of industrialization involved; and (7) the degree of separation established between the activities.

*Id.* (internal quotations omitted). One court also prioritized the relevant enterprise's primary purpose when deciding whether the similar FLSA recreational establishment exemption applied. *Chessin v. Keystone Resort Mgmt., Inc.*, 184 F.3d 1188, 1194 (10th Cir. 1999).

In this case, the parties agree on the effect of many of these factors on the agricultural exemption analysis. For instance, the parties have stipulated as to Wallace Pork's total annual gross revenue, its total annual gross revenue from the sale of hogs, and its total gross revenue from sales of animal feed between 2012 and 2015. Accordingly, there is no dispute that Wallace Pork's sales of animal feed amounted to 66–75% of its total annual gross revenue in those years

9

while its sale of hogs accounted for 24–32% of its total annual gross revenue.[6]  The parties have also stipulated that Wallace Pork sold about 75% of the combined feed it produced at the Feed Mill and purchased from Bi-County annually and that about 75–80% of the feed sold was produced at Bi-County.  Moreover, no one challenges the conditions of Kidd's or Risner's employment—their responsibilities, their pay, their complete separation from the work of the Hog Farm, their hours worked, the number and responsibilities of their co-workers.  Plaintiffs do not even dispute the outcome of the DOL's investigation in 2013 finding that previous Feed Mill employees were exempt from the overtime provisions of the FLSA.

Based on all these stipulations, Wallace Pork argues that no genuine disputes of material fact exist and that the Court should defer to the DOL's determination that the Feed Mill's work qualified for the FLSA's secondary agricultural exemption and confirm the relevance of its findings to Kidd's and Risner's subsequent work at the Feed Mill.  In support, Wallace Pork contends that its operations at the Feed Mill have not changed since the DOL issued its report.

Indeed, federal law dictates that a court should defer to agency determinations as guidance for its own decisionmaking even though they are not controlling authority for the court. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  The weight of an agency's determination "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade."  *Id.*  Greater deference is due to agency interpretations of ambiguous statutes so long as it is a permissible construction of the statute.  *Chevron U.S.A. v. Nat. Res. Defense Council*, 467 U.S. 837, 865 (1984).  An agency's construction of its own regulations are afforded the most

---

[6] The Court calculated these ranges by comparing the parties' stipulated percentages of Wallace Pork's feed sales and hog sales to its stipulated total gross revenue for each year from 2012 through 2015.  [*See* DE 19 at 2].

10

deference, upholding the agency's action unless it is "plainly erroneous." *Auer v. Robbins*, 519 U.S. 452, 461 (1997).

However, any deference this Court may afford the DOL's report requires recognition of the DOL's express statement that the Feed Mill's secondary agriculture designation may change in the future depending upon success with suppliers and clients. [DE 19-3 at 6]. Moreover, the DOL report explicitly warned Wallace Pork that "having a business with ADV approximating $26 million dollars will bring the attention of employees, plus private and public investors [such that the] practice performed today as secondary agriculture may be classified tomorrow as manufacturing." [*Id.*]. In other words, the DOL suggested that shifts in Wallace Pork's third party sales of animal feed and any resulting shift in the balance of the company's sources of revenue could justify a reclassification. Therefore, deference to the DOL's report requires this Court to assess whether the totality of circumstances, especially to the ratio of Wallace Pork's income streams, during the time of Kidd's and Risner's employment changed significantly enough from the time covered by the DOL's investigation to warrant reclassifying work at the Feed Mill from secondary agriculture to manufacturing.

As noted above, Wallace Pork argues that nothing of significance has changed. Specifically, Steve Wallace opined that the Feed Mill's primary purpose remained the same—to produce feed for the company's own hogs. Wallace Pork also pointed to decreases in its revenue from feed sales and total operations every year since the DOL report. Wallace himself reported that while the tonnage of feed sold to third parties fluctuated during Plaintiffs' employment, the numbers "lined up about right so that it could have been possible to use roughly all of the Wallace Pork-produced feed for internal purposes and roughly all of the [Bi-County] produced feed for outside customers." [DE 22-1 at 5, ¶ 15].

However, Wallace Pork fails to cite data to explain the DOL's conclusion that about 45% of total feed production from 2011 to 2013 was sold to third parties. Wallace Pork even admits that the DOL's 45% sales number cannot be fully explained. As such, Wallace Pork has not adequately accounted for the apparent increase in its sales to third parties from 45% during the DOL's investigation to 75% of its total feed production annually during Plaintiffs' employment. Nevertheless, Wallace Pork claims that the DOL number reflects sales of a consistent level with those during the time of Plaintiffs' employment. Not surprisingly, Plaintiffs argue that this data reflects a significant increase of 30% in Wallace Pork's sale of feed to third parties. Consequently, the Court cannot discern whether a significant change in the proportion of feed sold to third parties occurred from the time of the DOL report until the time of Plaintiffs' employment. While maybe not decisive on its own, this disputed fact will be material to the analysis of the total situation at the Feed Mill and will therefore affect any conclusion on whether the secondary agricultural exemption applies in this case.

Even more striking is Wallace Pork's failure to produce data specifying the total feed production and sales from the Feed Mill and Bi-County separately during the relevant period of Plaintiffs' employment. The cumulative production and sales data presented by Wallace Pork only allows Plaintiffs and this Court to infer how much feed was produced at the Feed Mill, sold to third parties, and used for Wallace Pork's own hogs. In their supplemental briefing to the instant motions, Plaintiffs presented their inferences in the form of calculations derived from the raw data produced by Wallace Pork. [DE 32-1 at 5–7]. Wallace Pork rejected Plaintiffs' calculations as "estimates piled on top of estimates, making the whole thing unreliable." [DE 34 at 4–5]. Yet, Wallace Pork has not countered Plaintiffs' "estimates" with calculations of its own

based on the same data. Accordingly, the Court faces a limited record, which prevents it from accepting or rejecting the validity of Plaintiffs' extrapolations.

Therefore, a genuine dispute of fact exists as to what proportion of the Feed Mill's feed output was sold to third parties. And while that factor alone will not dictate the outcome of the agricultural exemption analysis, the proportion of third party sales will affect any determination of whether Wallace Pork's Feed Mill operations shifted from an agricultural focus during the time of the DOL's investigation to a manufacturing focus during the period of Plaintiff's employment.

Taken together, these two genuine disputes of material fact preclude a conclusion that either party is entitled to summary judgment as a matter of law.

## III.  CONCLUSION

As discussed above, Plaintiffs have conceded that their state law claims are precluded by invocation of the FLSA. Therefore, the Court **GRANTS IN PART** Wallace Pork's motions for summary judgment on Plaintiffs' state law claims delineated in Count I of their Amended Complaints for Damages. ['210 case, DE 21; '211 case, DE 22].

Furthermore, the record before the Court reflects disputes as to (1) the proportion of Wallace Pork's total feed output sold to third parties and used to feed its own hogs; and (2) the percentage of feed produced at the Feed Mill that was sold to third parties during the period of Plaintiffs' employment. Without resolution of these facts, a genuine dispute of material fact exists as to whether the Feed Mill's operations changed significantly after the DOL issued its report in June 2013. Accordingly, the Court is unable to determine as a matter of law that the DOL's designation of Feed Mill operations as secondary agriculture remained valid during the period of Plaintiffs' employment. Therefore, the Court **DENIES** Plaintiffs' motions for partial

13

summary judgment on their FLSA claims. ['210 case, DE 20; '211 case, DE 21].  The Court also **DENIES IN PART** Wallace Pork's motions for summary judgment as to Plaintiffs' FLSA claims delineated at Count II of their Amended Complaints for Damages.  [DE '210, DE 21; '211 case, DE 22].

Lastly, the Court **SETS** both the '210 and '211 cases for a Telephonic Scheduling Conference on **October 10, 2017**, at **11:15 a.m. (E.D.T.)** for the purpose of setting a trial date and establishing trial-related deadlines.  The Court will call all counsel listed on the docket sheet unless it is notified that specified attorneys need not be contacted.  If, at the time of the scheduled conference, you will not be at the telephone number identified on the docket please contact chambers to provide an appropriate phone number.

**SO ORDERED.**

Dated this 2nd day of October 2017.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge